UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                                        Plaintiff,

            -against-

BRYAN ARIAS, HUGO A. ARIAS, ANTHONY
C. CICCONE, SALVATORE CICCONE, DIANE
KAYLOR, JASON A. KERYC, ANTHONY
MASSARO, CHRISTOPHER E. CURRAN,
RYAN K. DUNASKE, MICHAEL P. DUNNE,
MARTIN C. HARTMANN III, MICHAEL D.
KERYC, RONALD R. ROALDSEN JR., and
LAURA ANN TORDY,

                                        Defendants.
------------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**
12-cv-2937 (MKB)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this securities fraud litigation, on referral from the Honorable Margo K. Brodie for Report and Recommendation, is Plaintiff's Securities and Exchange Commission ("Plaintiff" or the "SEC" or "Commission") Motion for Damages.  *See* Docket Entry ("DE") [132].  By way of Complaint dated June 12, 2012, Plaintiff brings this action against Bryan Arias, Hugo Arias, Anthony Ciccone, Salvatore Ciccone, Christopher E. Curran ("Curran"), Ryan K. Dunaske ("Dunaske"), Michael P. Dunne ("Dunne"), Martin C. Hartmann, III ("Hartmann"), Diane Kaylor ("Kaylor"), Jason Keryc, Michael Keryc, Anthony Massaro ("Massaro"), Ronald R. Roaldsen, Jr. ("Roaldsen"), and Laura Ann Tordy ("Tordy," and collectively, "Defendants"), alleging violations of:  (i) Sections 5(a), 5(c) and 17(a) of the Securities

Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a); (ii) Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78c(a)(1); and (iii) Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.  *See* Complaint ("Compl."), DE [1].

Having established liability, *see* DE [50-51], [54], [75], [86-87], [89], [93], [95], [100], [102], [113-14], the Commission now seeks monetary relief in the form of disgorgement, prejudgment interest on the disgorgement, and civil penalties from Salvatore Ciccone, Curran, Dunaske, Dunne, Michael Keryc and Roaldsen (the "Motion Defendants").  For the reasons set forth herein, the Court respectfully recommends granting the motion.

## I. BACKGROUND

Unless otherwise indicated, the facts set forth herein are taken from the Complaint and are accepted as true pursuant to the consent judgments entered into and described more fully below.  *See* DE [50-51], [54], [75], [86-87], [89], [93], [95], [100], [102], [113-14].

### A.    <u>**Relevant Facts**</u>

Defendants, with the exception of Massaro, are New York residents.  *See* Compl. ¶¶ 15-28.  Each was a principal sales agent for Agape World, Inc. ("Agape"), a New York corporation and $415 million Ponzi scheme organized by president Nicholas J. Cosmo ("Cosmo") that, from 2005 through January 2009, held itself out to be a provider of short-term, high interest bridge loans to commercial borrowers, and offered and sold investments to over 5,000 investors nationwide, including more than one thousand investors on Long Island, New York.  *See id.* ¶¶ 1, 30.  Agape was

never registered with the SEC in any capacity. *See id.* ¶ 30. Bryan and Hugo Arias, Anthony and Salvatore Ciccone, Kaylor, Jason Keryc and Massaro held themselves out to investors as brokers, account representatives and vice presidents for Agape (collectively, "Brokers"). *See id.* ¶ 2. Curran, Dunaske, Dunne, Hartmann, Michael Keryc and Roaldsen were "Sub-Brokers" for Jason Keryc, and Tordy was a Sub-Broker for Hartmann (collectively, "Sub-Brokers"). *See id.*

All Defendants repeatedly sold investments that Agape offered, and promised investors "outsize returns," typically 12 to 14 percent, in as few as eight to ten weeks for their participation in high interest bridge loans purportedly made by Agape to commercial borrowers (the "Agape Investment Contracts"), as well as that 99 percent of each investment was "secured by first position asset lien (UCC) equaling 100% of investment" and that the investment was "held" at Agape in "'custodian' to client's account." *See id.* ¶¶ 3, 31, 35. Defendants also sold investments offered by Agape Merchant Advance LLC ("AMA"), a New York limited liability company and off-shoot of Agape, that promised investors a four percent monthly return for their participation in short term loans made by AMA to businesses that accepted credit cards ("AMA Investment Contracts" and, together with the Agape Investment Contracts, "Agape Securities"). *See id.* ¶ 3. AMA was never registered with the Commission in any capacity. *See id.* ¶ 31. All of the Agape Securities promised investors that only one percent of their principal was at risk. *See id.* ¶ 3.

The Agape Securities were fictitious, with, "at best," a fraction of investor funds used as Defendants represented. *See id.* ¶ 4. Dunne, Hartmann, Michael Keryc and

Tordy each knowingly, recklessly, and repeatedly, made misrepresentations to investors concerning the Agape Securities, the use to which investor funds would be put and the safety of the investments, and urged investors to "rollover" their principal and earned interest from one Agape Security to the next, as each matured, in an effort to perpetuate their scheme by offering the new securities shortly thereafter. *See id.* ¶¶ 5, 38. As the scheme progressed, the number of investment opportunities Agape offered increased. *See id.* ¶ 39. Dunne, Hartmann, Michael Keryc and Tordy each knowingly or recklessly, and repeatedly, offered and sold Agape Securities despite "numerous signs of fraud," including Cosmo's prior conviction for fraud, the "too-good-to-be-true" returns and incredible safety of principal promised to investors, Agape's status as a relatively small and unknown private issuer of securities, a series of extensions and defaults by Agape, and "dire warnings" about Agape's financial condition, and continued to sell Agape Securities as the scheme began to collapse in 2008. *See id.* ¶¶ 6, 66-98.

Defendants, as well as the instructions contained in the Agape Securities themselves, directed investor funds to accounts that Cosmo controlled. *See id.* ¶7. Cosmo made commission or other payments of over $52 million to the Brokers, lost $80 million trading futures in personal accounts, and returned $232 million to investors. *See id.* During the relevant period, Defendants, Cosmo and his employees raised at least $415,413,336 from investors with, at best, $21,943,479, or 5.28 percent, used as represented to investors to make loans to commercial borrowers or to businesses that accepted credit cards. *See id.* ¶¶ 7, 44.

While selling Agape Securities, none of the Defendants were registered with the SEC in any capacity or associated with a registered broker or dealer, despite acting as brokers and regularly and actively soliciting investors to purchase Agape Securities, as well as repeatedly offering and selling, and receiving commissions or other compensation for, Agape Securities. *See id.* ¶¶ 8, 99-105. On January 27, 2009, Cosmo was arrested on a criminal complaint filed in this Court, and the scheme came to an end. *See id.* ¶ 9. Cosmo subsequently pleaded guilty to one count each of wire and mail fraud and was sentenced to 300 months in prison. *See id.* On April 25, 2012, Anthony Ciccone, Kaylor, Jason Keryc and Massaro were arrested on a criminal complaint in this Court, charging each of them, based on their conduct as Agape Brokers, with one count of conspiracy to commit mail fraud. *See id.* ¶ 10. On February 5, 2009, certain Agape investors filed an involuntary Chapter 7 petition in the United States Bankruptcy Court for the Eastern District of New York against Agape, AMA, and related entities. *See id.* ¶ 30.

## 1. The Brokers

The Brokers, on at least one occasion, knowingly or recklessly oversold an Agape Investment Contract. *See id.* ¶¶ 62-65. Specifically, in 2008, an Agape employee provided the total loan amount, or the total amount that could be raised from investors participating in the loan, for a loan Agape was making to another company. *See id.* ¶¶ 62-63. Nevertheless, Hugo Arias, Kaylor, Jason Keryc, Massaro, Bryan Arias, and Anthony and Salvatore Ciccone each sold significantly higher participation in the loan than provided for. *See id.* ¶¶ 64-65.

During the relevant period, all of the Brokers offered and sold Agape Securities to investors. *See id.* ¶¶ 15-21. They each incorporated at least one business and used accounts in those businesses' names for Agape-related Banking. *See id.* The Brokers corresponded with investors, falsely promising the safety and use of investment funds and creating false investor presentations and materials. *See id.* ¶¶ 47-56.

The specific sales and profits of each Broker during the relevant period is as follows: (i) Bryan Arias offered and sold Agape Securities to at least 195 investors and received at least $1,720,260 in gross commissions or other payments from Agape and AMA, *see id.* ¶ 15; (ii) Hugo Arias offered and sold Agape Securities to at least 1,419 investors and received at least $7,926,835 in gross commissions or other payments from Agape and AMA, *see id.* ¶ 16; (iii) Anthony Ciccone offered and sold Agape Securities to at least 535 investors and received at least $11,735,518 in gross commissions or other payments from Agape and AMA, *see id.* ¶ 17; (iv) Salvatore Ciccone offered and sold Agape Securities to at least 348 investors and received at least $5,502,898 in gross commissions or other payments from Agape and AMA, *see id.* ¶ 18; (v) Kaylor offered and sold Agape Securities to at least 249 investors and received at least $3,708,818 in gross commissions or other payments from Agape and AMA, *see id.* ¶ 19; (vi) Jason Keryc, offered and sold Agape Securities to at least 1,617 investors and received at least $16,225,664 in gross commissions or other payments from Agape and AMA, and paid other individuals, including all of the Sub-Brokers except Tordy, collectively at least $7,400,573 from his business accounts in commissions or other payments to sell Agape Securities for him, *see id.* ¶ 20; and (vii)

6

Massaro offered and sold Agape Securities to at least 826 investors and received at least $5,920,732 in gross commissions or other payments from Agape and AMA. *See id.* ¶ 21.

### 2. The Sub-Brokers

During the relevant period, all of the Sub-Brokers, with the exception of Tordy, worked for Jason Keryc. *See id.* ¶¶ 22-28. They each incorporated at least one business and used accounts in those businesses' names for Agape-related Banking. *See id.* Curran and Dunne were associated with registered broker-dealers prior to their involvement in Agape, and Curran was associated with a registered broker-dealer after as well. *See id.* ¶¶ 22, 24. The Sub-Brokers corresponded with potential investors, falsely promising the safety and use of investment funds. *See id.* ¶¶ 33-38, 43, 45-46, 57-61, 66-86, 89, 92, 99-100.

The specific sales and profits of each Sub-Broker during the relevant period is as follows: (i) Curran offered and sold Agape Securities to at least 132 investors and received at least $531,890 in commissions or other payments from Jason Keryc, *see id.* ¶ 22; (ii) Dunaske offered and sold Agape Securities to at least 70 investors and received at least $483,765 in commissions or other payments from Jason Keryc, and $234,699 in gross payments from Agape, *see id.* ¶ 23; (iii) Dunne offered and sold Agape Securities to at least 99 investors and received at least $1,584,413 in commissions or other payments from Jason Keryc, *see id.* ¶ 24; (iv) Hartmann offered and sold Agape Securities to at least 441 investors and received at least $3,285,084 in commissions or other payments from Jason Keryc and $309,734 in gross payments

from Agape and AMA, and paid Tordy at least $981,899 from his business accounts in commissions or other payments to sell Agape Securities for him, *see id.* ¶ 25; (v) Michael Keryc offered and sold Agape Securities to at least 177 investors and received at least $1,002,812 in commissions or other payments from Jason Keryc, *see id.* ¶ 26; (vi) Roaldsen offered and sold Agape Securities to at least 159 investors and received at least $512,610 in commissions or other payments from Jason Keryc and $92,751 in gross payments from Agape, *see id.* ¶ 27; and (vii) Tordy offered and sold Agape Securities to at least 441 investors and received at least $981,899 in commissions or other payments from Hartmann, and $80,000 in gross payments from Agape. *See id.* ¶ 28.

**B.    Procedural History**

Based on the above, Plaintiff commenced this action on June 12, 2012. *See generally* Compl. The Complaint seeks damages and injunctive relief, and alleges four causes of action: (i) violations of Section 17(a) of the Securities Act against Bryan and Hugo Arias, Anthony and Salvatore Ciccone, Kaylor, Jason and Michael Keryc, Massaro, Dunne, Hartmann and Tordy; (ii) violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Bryan and Hugo Arias, Anthony and Salvatore Ciccone, Kaylor, Jason and Michael Keryc, Massaro, Dunne, Hartmann and Tordy; (iii) violations of Section 15(a) of the Exchange Act against all Defendants; and (iv) violations of Sections 5(a) and 5(c) of the Securities Act against all Defendants. After the United States intervened in this action and discovery was stayed, DE [45-47], final judgments were rendered as to Hartmann and Tordy on July 2, 2013. *See* DE

[50-51].  On October 1, 2015, Judge Hurley granted a motion for judgment based on settlement as to Hugo Arias and Jason Keryc.  *See* DE [54].  Judge Hurley lifted the stay on October 31, 2018, *see* Electronic Order dated October 31, 2018, and granted a motion for judgment based on settlement as to Michael Keryc on June 13, 2019.  *See* DE [75].  After this Court entered a discovery Scheduling Order, *see* DE [81], Judge Brodie entered judgment in favor of the Commission against Massaro and Curran on August 16, 2019, against Dunne on October 25, 2019, against Roaldsen on November 25, 2019, against Dunaske on December 16, 2019, against Anthony Ciccone on April 3, 2020, against Kaylor on April 21, 2020, against Salvatore Ciccone and against Hugo Arias, Anthony Ciccone, Kaylor, Jason Keryc and Massaro together on October 30, 2020.  *See* DE [86-87], [89], [93], [95], [100], [102], [113-14].

Each of the judgments entered into (the "Consent Judgments") order injunctions against future violations of the securities laws and provide that the SEC's claims for monetary relief will be decided on motion by the Commission.  *See id.* Under the terms of the Consent Judgments, Defendants are precluded from arguing that they did not violate the securities laws, and the allegations in the Complaint are to be accepted and deemed true by the Court.  *See id.*  On May 6, 2021, Judge Brodie dismissed the claims against Bryan Arias with prejudice, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 41(a)(2), and set a briefing schedule for the instant motion as to damages sought from the Motion Defendants.  *See* Electronic Order dated May 6, 2021.

On July 16, 2021, the Commission filed this motion seeking monetary relief from the Motion Defendants in the forms of disgorgement, prejudgment interest on the disgorgement, $130,000 in civil penalties from each of Dunne and Michael Keryc, and $65,000 in civil penalties from each of Salvatore Ciccone, Curran, Dunaske and Roaldsen.   *See* Memorandum of Law in Support of Securities and Exchange Commission's Motion for Monetary Relief ("Pl. Mem."), DE [133].   The Motion Defendants oppose the motion.  *See* June 16, 2021 Declaration of Melvyn K. Roth on behalf of Curran ("Roth Decl."), DE [135]; June 16, 2021 Declaration of Christopher E. Curran ("Curran Decl."), DE [136]; Memorandum of Law of Ryan Dunaske in Opposition to Securities and Exchange Commission's Motion for Monetary Relief ("Dunaske Opp."), DE [137]; June 23, 2021 Declaration of Michael Dunne ("Dunne Decl."), DE [138]; Memorandum of Law of Michael Dunne in Opposition to Securities and Exchange Commission's Motion for Monetary Relief ("Dunne Opp."), DE [139]; and Defendants' Keryc and Roaldsen Opposition to Commission's Motion for Monetary Relief ("Keryc and Roaldsen Opp."), DE [140].  For the reasons set forth below, the Court respectfully recommends granting the motion.

## II. DISCUSSION

The SEC requests monetary relief from the Motion Defendants in the forms of: (i) disgorgement; (ii) prejudgment interest on the disgorgement; and (iii) $130,000 in civil penalties from each of Dunne and Michael Keryc, and $65,000 in civil penalties from each of Salvatore Ciccone, Curran, Dunaske, and Roaldsen.  *See* Pl. Mem. at 1.

## A. **Disgorgement**

### i. **Legal Standards**

A district court has broad discretion to order disgorgement of profits obtained through violation of federal securities laws and, if ordered, in calculating the disgorgement amount. *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996); *see also SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972). "The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997); *First Jersey*, 101 F.3d at 1474. "[D]isgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court." *S.E.C. v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). "In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his [violation]." *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009), *aff'd* 438 Fed.Appx. 23 (2d Cir. 2011). The disgorgement amount need only be a "reasonable approximation of profits causally connected to the violation." *SEC v. Patel*, 61 F.3d 137, 139–40 (2d Cir. 1995) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231–32 (D.C. Cir. 1989)); *see also SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) ("[B]ecause of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude.").

Disgorgement "is a method of forcing a defendant to give up the amount by which he was unjustly enriched." *SEC v. Commonwealth Chemical Securities, Inc.*,

574 F.2d 90, 102 (2d Cir. 1978).   Accordingly, in order to establish a proper disgorgement amount, "the party seeking disgorgement must distinguish between the legally and illegally derived profits," *CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 93 (2d Cir. 1986), *cert. denied*, 479 U.S. 853, 107 S.Ct. 186 (1986), so that disgorgement is ordered only with respect to those that were illegally derived.   Once the SEC has met its burden, "the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'" *Razmilovic*, 738 F.3d at 31 (quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)).   Defendants are "entitled to prove that the . . . measure is inaccurate," *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (citing *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994)), but the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *First Jersey*, 101 F.3d at 1475.   Ultimately, however, the final decision as to the amount of disgorgement rests with the district court.  *See id.* at 1474-75.

Pursuant to recent Supreme Court decisions, SEC disgorgement constitutes a "penalty," subject to a five-year statute of limitations, and is "equitable relief permissible under § 78u(d)(5)" so long as it "does not exceed a wrongdoer's net profits and is awarded for victims."  *See Liu v. SEC*, __ U.S. __, __, 140 S. Ct. 1936, 1940 (2020); *Kokesh v. S.E.C.*, __ U.S. __, __, 137 S. Ct. 1635, 1639 (2017).   The Supreme Court has carved out an exception, however, when the "entire profit of a business or undertaking" results from the wrongful activity.  *Liu*, __ U.S. at __, 140 S.Ct. at 1945. In such cases, the defendant "will not be allowed to diminish the show of profits by

putting in unconscionable claims for personal services or other inequitable deductions." *Id.* Nevertheless, setting aside that circumstance, courts consistently restrict awards to net profits from wrongdoing after deducting legitimate expenses. Such remedies, when assessed against only culpable actors and for victims, fall comfortably within "those categories of relief that were typically available in equity." *Liu*, __ U.S. at __, 140 S. Ct. at 1945–46.

### ii. <u>Analysis</u>

The Commission calculates the Motion Defendants' net profits appropriate for disgorgement as follows:

- Curran:  $208,933.52
- Dunaske:  $214,444.92
- Dunne:  $845,409.43
- Michael Keryc:  $809,485.17
- Roaldsen:  $253,745.80

*See* May 14, 2021 Declaration of Roseann Daniello ("Daniello Decl."), DE [134], ¶¶ 11-15.

The SEC uses the following formula to calculate the net profits for each of the Motion Defendants:  payments received for selling Agape Securities within five years prior to the filing of this action – from June 2007 to January 2009, less amounts they invested in Agape Securities during the same period, less amounts returned to investors and paid to brokers or other Agape employees during the same period, less amounts forfeited in the United States Attorney's Office's civil forfeiture action, and less amounts paid in the Agape bankruptcy.  *See* Pl. Mem. at 9-10; Daniello Decl. ¶¶ 4-9.  The SEC submits affidavits and exhibits containing the financial records of each

of the Motion Defendants that analyzed and reviewed others' analyses of Agape
financial records to reach these calculations. *See* Daniello Decl. ¶ 6; Exhibits ("Exs.")
A-G to the Daniello Decl., DE [134-1]-[134-7].

After consideration of these submissions, the Court is satisfied that the
requested disgorgement award is a "reasonable approximation of profits causally
connected" to the Defendants' Ponzi scheme. *Patel*, 61 F.3d 137, 139 (quoting *First
City Fin. Corp.*, 890 F.2d at 1231). The Court agrees with the Commission that the
proper metric for calculating disgorgement in actions such as this is subtracting the
amount returned to investors, invested in Agape, or forfeited, from the total amount
raised through the fraudulent offerings. *See, e.g., SEC v. Pittsford Capital Income
Partners, LLC*, No. 06 Civ 6353, 2007 WL 2455124, at *16 (W.D.N.Y. Aug. 23, 2007)
(calculating disgorgement by subtracting the total amount paid back to investors as
redemptions from the total amount raised through the fraudulent offerings), *aff'd* 305
Fed.Appx. 694 (2d Cir. 2008); *SEC v. Haligiannis*, 470 F.Supp.2d 373, 384-85
(S.D.N.Y. 2007) ("The Court finds a proper estimation of defendant's ill-gotten gains
to be the total difference between contributions and distributions after the fraud
began."); *SEC v. Invest Better 2001*, No. 01 Civ. 11427, 2005 WL 2385452, at *3-*4
(S.D.N.Y. May 4, 2005) (calculating disgorgement in Ponzi scheme by subtracting
total distributions from total contributions).

Establishing uncertainty as to these amounts falls to the Motion Defendants,
who fail to refute the SEC's calculations. Rather, the Motion Defendants maintain
that they are in financial straits and unable to pay the calculated disgorgement

14

amounts, despite receiving considerable sums of money from selling Agape Securities. While this may be, ability to pay is not a not among the factors considered when evaluating whether disgorgement is appropriate. *See S.E.C. v. Taber*, No. 13 Misc. 282(KBF), 2013 WL 6334375, at \*2 (S.D.N.Y. Dec. 4, 2013) (quoting *SEC v. McCaskey*, No. 98 Civ. 6153(SWK)(AJP), 2002 WL 850001, at \*5 (S.D.N.Y. Mar. 26, 2002)) ("As a policy matter, declining to take a wrongdoer's financial situation into account is logical—'whether or not the defendant may have squandered and/or hidden ill-gotten profits' should not determine the amount disgorged; similarly, the likelihood that the SEC will in fact be repaid is unrelated to the amount by which a wrongdoer was improperly enriched."); *S.E.C. v. Enrenkrantz King Nussbaum, Inc.*, No. CV 05-4643 MKB GRB, 2013 WL 831181, at \*4 (E.D.N.Y. Feb. 14, 2013), *report and recommendation adopted sub nom. S.E.C. v. Murray*, No. 05-CV-4643 MKB, 2013 WL 839840 (E.D.N.Y. Mar. 6, 2013); *Universal Exp., Inc.*, 646 F.Supp.2d at 565 ("In deciding a motion for disgorgement, a court is not bound to consider a defendant's claims of financial hardship").

Curran also argues that any disgorgement amount entered against him should be credited to reflect the taxes he paid on his earnings from Jason Keryc, for whom he worked as a Sub-Broker. *See* Curran Decl. ¶ 4.[1]  The Court disagrees based on caselaw to the contrary.  *See S.E.C. v. Dibella*, No. 04 Civ. 1342(EBB), 2008 WL

---

[1] Curran and several other Motion Defendants also maintain that because the Commission often refers to "Defendants" in its Complaint in lieu of specific names, such allegations are not brought against them specifically, and that they had no knowledge of any wrongdoing, lacked scienter, and were not paid by Agape Securities.  *See* Melvyn Decl. ¶¶ 5-9; Curran Decl. ¶¶ 2-3; Dunne Decl. ¶¶ 4-8; Dunne Opp. at 1-2.  These arguments are unavailing, as the Consent Judgments make clear that all allegations in the Complaint are deemed true, and the Motion Defendants may not argue that they did not violate the securities laws.

6965807, at *3 (D.Conn. Mar.13, 2008) (finding that taxes are not among the direct transaction costs that courts may, in their discretion, deduct from the disgorgement amount), *aff'd*, 587 F.3d 553 (2d Cir. 2009); *S.E.C. v. Zwick*, No. 03 Civ. 2742(JGK), 2007 WL 831812, at *24 (S.D.N.Y. Mar. 16, 2007) (same), *aff'd*, 317 F. App'x 34 (2d Cir. 2008).18; *see also U.S. S.E.C. v. Syndicated Food Serv. Int'l, Inc.*, No. 04-CV-1303 NGG VLS, 2014 WL 1311442, at *19 (E.D.N.Y. Mar. 28, 2014).

Dunaske seeks a reduction based on his $30,000 payment to satisfy the avoidable preference claim against him in the Agape bankruptcy proceeding. The SEC calculations, however, already take this payment into account. *See* Daniello Decl. Ex. C; Dunaske Opp. Accordingly, the Court recommends declining to lower Dunaske's disgorgement amount any further.

Similarly, Dunne seeks a reduction based on a confession of judgment that he signed as the president of the business he incorporated in connection with his sales of Agape Securities, Arctic Wolf, Inc. ("ARC"), in the full amount sought by the trustee in the Agape bankruptcy proceeding of approximately $1.4 million, and because he returned "substantial" funds to two investors, and "did not contest the civil forfeiture action against several accounts in his name and ARC's," ultimately forfeiting $31,243.53. *See* Dunne Opp. at 2. Dunne also maintains that he "disclosed what [he] knew about Agape to the federal government [and] met on numerous occasions with federal prosecutors and federal agents." *See* Dunne Decl. ¶ 10.

None of Dunne's arguments have merit. The Bankruptcy Code states that a bankruptcy discharge does not discharge debts arising from violations of the federal

securities laws. *See* 11 U.S.C. § 523(a)(19). Further, "[n]either a defendant's cooperation with a subsequent investigation, nor his claims of financial hardship, are sufficient to preclude disgorgement or reduce the disgorgement amount." *S.E.C. v. Mortenson*, No. 04 Civ. 2276(SJF)(WDW), 2013 WL 991334, at *5 (E.D.N.Y. Mar. 11, 2013). Accordingly, these arguments are rejected.

Finally, Michael Keryc and Roaldsen argue that the parties should be directed to mediation by virtue of the Court's discretion but cite no authority to support this request as a basis to deny the SEC's motion. As a result, this argument does not impact the Court's analysis.

Based on the above, the Court recommends that the Commission be awarded the following amounts in disgorgement: (i) $208,933.52 as to Curran; (ii) $214,444.92 as to Dunaske; (iii) $845,409.43 as to Dunne; (iv) $809,485.17 as to Michael Keryc; and (v) $253,745.80 as to Roaldsen, which reasonably reflect the amounts of these Motion Defendants' ill-gotten gains.[2]

### B. Prejudgment Interest

#### i. Legal Standards

As with disgorgement, a district court has broad discretion to order prejudgment interest to ensure that violators do not profit from illegal activity. *See SEC v. Universal Express, Inc.*, 475 F.Supp.2d 412, 428 (S.D.N.Y. 2007); *Universal Express, Inc.*, 646 F.Supp.2d at 566 ("[A] court has the discretion to award prejudgment interest on the amount of disgorgement and to determine the rate at

---

[2] The SEC maintains that Salvatore Ciccone did not retain any net profit, and accordingly, the Commission is not seeking disgorgement as to him. *See* Pl. Mem. at 10 n.3; Daniello Decl. ¶ 10.

which such interest should be calculated."). "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F.Supp. 286, 295 (S.D.N.Y. 1996). In considering whether to award prejudgment interest, a court should consider: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey*, 101 F.3d at 1476 (internal quotation marks omitted). "In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance." *Id.* "Prejudgment interest is generally calculated at the rate used by the Internal Revenue Service for interest on underpaid taxes under 26 U.S.C. § 6621(a)(2) because '[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud.'" *S.E.C. v. Aimsi Techs., Inc.*, 650 F.Supp.2d 296, 304 (S.D.N.Y. 2009) (quoting *First Jersey*, 101 F.3d at 1476).

## ii. <u>Analysis</u>

The Commission calculates the prejudgment interest on the Motion Defendants' disgorged net profits as follows:

- Salvatore Ciccone: $0
- Curran: $53,788.01
- Dunaske: $55,206.91
- Dunne: $217,642.96
- Michael Keryc: $208,394.60
- Roaldsen: $65,324.55

18

*See* Pl. Mem. at 11; Daniello Decl. ¶ 17.  The combined total for disgorgement plus prejudgment interest amounts to:

- Salvatore Ciccone:  $0
- Curran:  $262,721.53
- Dunaske:  $269,651.83
- Dunne:  $1,063,052.39
- Michael Keryc:  $1,017,879.77
- Roaldsen:  $319,070.35

*See* Pl. Mem. at 11; Daniello Decl. ¶ 17.

The Court has considered the factors listed above, placing special importance on the remedial purpose of the securities laws, and concludes that the prejudgment interest sought is warranted in this case.  Defendants should not be unjustly enriched by an interest-free use of the funds they fraudulently obtained from investors.  *See S.E.C. v. Tourre*, 4 F. Supp. 3d 579, 591 (S.D.N.Y. 2014) ("[P]rejudgment interest ensures that the defendant does not profit from his ill-gotten gains, including the time value of money") (internal quotations omitted).

In opposition, Keryc and Roaldsen argue that Congress, in expressly providing for disgorgement in the National Defense Authorization Act for Fiscal Year 2021, H.R. 6395 (116th) (enacted – veto overridden Jan. 1, 2021) (the "NDAA"), intended that prejudgment interest should not be awarded because the statute does not mention prejudgment interest.  *See* Keryc and Roaldsen Opp. at 5.  This contention is undermined by opinions from this Circuit published after the NDAA's effective date that award prejudgment interest.  *See, e.g.*, *S.E.C. v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (awarding disgorgement "plus prejudgment interest"); *S.E.C. v. Thompson*, No.

14 CIV. 9126 (ALC), 2021 WL 4892855, at *2 (S.D.N.Y. Oct. 20, 2021) (finding defendant "liable for disgorgement . . . together with prejudgment interest thereon"). Accordingly, the Court recommends that the Commission be awarded prejudgment interest on the disgorgement amounts listed above from June 2012 through 2018.

### C. Civil Penalties

#### i. Legal Standards

The Securities Act and the Exchange Act authorize three tiers of civil penalties. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Under each statute, a first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. *See Razmilovic*, 738 F.3d at 38 (citation omitted). At each tier, "for each violation, the amount of penalty shall not exceed the greater of [1] a specified monetary amount or [2] the defendant's gross amount of pecuniary gain." *Id.* (citation omitted). Pursuant to the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, the statutory maximum penalty amounts were adjusted for inflation for violations occurring after February 14, 2005. *See* Adjustments to Civil Monetary Penalty Amounts, Release Nos. 33-8530, 34-51136, dated Feb. 9, 2009 (Effective Feb. 14, 2005), previously found at 17 C.F.R. § 201.1003 and Table III to Subpart E of Part 201 (available at: https://www.sec.gov/rules/final/33-8530.htm). Accordingly, for the relevant time period here, the statutory amounts for penalties for natural persons

are:  (i) a first-tier penalty of $6,500; (ii) a second-tier penalty of $65,000; and (iii) a third-tier penalty of $130,000.

A defendant's disgorgement amount is a "helpful starting point" for calculating that defendant's gross pecuniary gain, but several adjustments must be made.  *See SEC. v. Cole*, 12 Civ. 8167(RJS), 2014 WL 4723306, at *6 (S.D.N.Y. Sept. 22, 2014); *see also SEC v. Amerindo Inc. Advisors, Inc.*, No. 05 Civ. 5231(RJS), 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014).  First, unlike disgorgement, gross pecuniary gain may only include gains from frauds occurring within the five-year statute of limitations for civil penalties.  *See Amerinda*, 2014 WL 2112032 at *11 (citing *Gabelli v. SEC*, 568 U.S. 442, 446-48, 133 S.Ct. 1216, 1220–21 (2013)).  Second, the civil penalty statutes require that such awards be based on the pecuniary gain of each defendant and do not allow the penalties to be imposed jointly and severally.  *See SEC v. Pentagon Capital Mgmt., PLC*, 725 F.3d 279, 287-88 (2d Cir. 2013).

Beyond these restrictions, the amount of the penalty is within "the discretion of the district court," *Razmilovic*, 738 F.3d at 38, and should be determined "in light of the facts and circumstances" surrounding the violations.  15 U.S.C. § 78u.  Courts in this circuit have looked to a number of factors in this regard, often referred to as the "*Haligiannis* Factors," including:  (i) the egregiousness of the defendant's conduct; (ii) the degree of the defendant's scienter; (iii) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (iv) whether the defendant's conduct was isolated or recurrent; and (v) whether the penalty should be reduced due to the defendant's demonstrated current and future

financial condition.  *See SEC v. Rajaratnam*, 822 F.Supp.2d 432, 433 (S.D.N.Y. 2011) (quoting *Haligiannis*, 470 F.Supp.2d at 386); *see also SEC v. Gupta*, 569 F. App'x 45, 48 (2d Cir. 2014) (citing *Haligiannis*).

The penalty provisions of the relevant securities laws do not provide how to quantify the total number of violations when calculating civil penalties, *see* 15 U.S.C. §§ 77t(d), 78u(d)(3), 80b–9(e), but courts have determined the number of violations using several methods.  *See In re Reserve Fund Secs. and Derivative Litig.*, Nos. 09 MD 2011, 09 Civ. 4346(PGG), 2013 WL 5432334, at *20 (S.D.N.Y. Sep. 30, 2013).  The Court may, for instance, look to the number of investors defrauded or the number of fraudulent transactions to determine the number of violations.  *See id.*; *SEC v. Elliot*, No. 09 Civ. 7594(KBF), 2012 WL 2161647, at * 11 (S.D.N.Y. Jun. 12, 2012) (counting each transaction as a separate violation); *SEC v. Glantz*, No. 94 Civ. 5737(LAP), 2009 WL 3335340, at *6 (S.D.N.Y. Oct. 13, 2009) (assessing one violation for each victim); *SEC v. Milan Capital Grp., Inc.*, No. 00 Civ. 108(DLC), 2001 WL 921169, at *3 (S.D.N.Y. Aug. 14, 2001) (same); *SEC v. Kenton Capital Ltd.*, 69 F.Supp.2d 1, 17 n. 15 (D.D.C.1998) (same)).  In the alternative, the Court may consider the number of statutes that each Defendant violated, or whether the violations were all part of a single scheme.  *See SEC v. Shehyn*, No. 04 Civ.2003(LAP), 2010 WL 3290977, at *8 (S.D.N.Y. Aug. 9, 2010) (assessing penalty for each statute violated); *SEC v. Johnson*, No. 03 Civ. 177(JFK), 2006 WL 2053379, at *10 (S.D.N.Y. Jul. 24, 2006) (assessing penalty for each statutory violation found by jury); *SEC v. Rabinovich & Assocs., LP*,

No. 07 Civ. 10547(GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (finding one violation where defendant's conduct was part of "a single scheme or plan").

### ii.  Analysis

The SEC requests that the Court impose a one-time second or third tier penalty against each of the Motion Defendants.  Specifically, the Commission seeks:  (i) one second tier penalty of $65,000 from each of Salvatore Ciccone, Curran, Dunaske and Roaldsen; and (ii) one third tier penalty of $130,000 from each of Dunne and Michael Keryc. *See* Pl. Mem. at 13-14.  For the reasons set forth below, the Court recommends imposing each of the requested civil penalties.[3]

The first four *Haligiannis* factors weigh in favor of the imposition of civil penalties against all the Motion Defendants.  Initially, taking the allegations in the Complaint as true pursuant to the Consent Judgments, each of the Motion Defendants offered and sold Agape Securities to between 70 and 348 investors, each ultimately receiving at least half a million dollars and up to $5 million in commissions and payments from Agape.  At least some of these investors were the Motion Defendants' family and friends, and likely unsophisticated.  All of the Motion Defendants knowingly or recklessly made misrepresentations and false promises directly to investors to induce them to buy these securities.  They did so without registering the Agape Securities or themselves as broker-dealers, even though some of them had experience as or associated with registered broker-dealers prior to their

---

[3] Salvatore Ciccone, appearing *pro se*, does not oppose Plaintiff's motion.  Accordingly, even if the *Haligiannis* factors did not weigh in favor of imposing civil penalties, the Court recommends that Salvatore Ciccone be ordered to pay one second tier penalty of $65,000.

involvement with Agape. The Motion Defendants' actions involved fraud, deceit and deliberate disregard of regulatory requirements, and constitute egregious conduct.

Next, despite the fact that several of the Motion Defendants improperly argue that they lacked scienter, each of them recklessly disregarded the fact that neither they nor the Agape Securities were registered, as well as the many indicia of possible fraud on the parts of Agape and Cosmo. The Sub-Broker Motion Defendants cannot hide behind the fact that they were not technically Agape employees to excuse their misrepresentations and blatant falsities.

Moreover, although a showing that a defendant created substantial losses or the risk of substantial losses to others is only required for a third tier penalty, all of the Motion Defendants' conduct created at least the risk of substantial losses to others. The very purpose of requiring securities be registered, or to fall under an authorized exemption, prior to sale to the investing public is to protect the public. Moreover, the Motion Defendants' conduct, perpetrated over a period of several years, resulted in substantial losses to investors. As a result of the Motion Defendants' conduct, hundreds of investors lost large sums of money. Accordingly, maximum second and third tier penalties are appropriate. *See, e.g., U.S. SEC v. E. Delta Res. Corp.*, No. 10–CV–310, 2012 WL 3903478, at *9 (E.D.N.Y. Aug. 31, 2012) (maximum third and tier penalties for violations imposed where "defendants' conduct, at minimum, directly or indirectly . . . created a significant risk of substantial losses to other persons"); *SEC v. Stone*, No. 06 Civ. 6258, 2009 WL 82661, at *7 (S.D.N.Y. Jan.

13, 2009) (maximum second tier penalty imposed where defendant's conduct "created a high risk of loss to investors who bought the stock in reliance on such fraud").

Finally, the Motion Defendants' conduct was not isolated. Rather, they each sold Agape Securities to dozens, if not hundreds, of investors, making the same misrepresentations over multiple years each and receiving substantial commissions and/or gross payments from Agape. Accordingly, second and third tier penalties are again appropriate.

The Motion Defendants counter that their current financial hardships weigh against imposition of the full amounts of civil penalties. Generally, however, even largely undisputed "claims of poverty cannot defeat the imposition of a disgorgement order or civil penalty," as imposing no penalty "would not serve the purposes of the securities laws." *SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341 at * 4 (S.D.N.Y. Aug. 23, 2002); *see also SEC v. Palmisano*, 135 F.3d 860, 864-66 (2d Cir. 1998), *cert. denied*, 525 U.S. 1023, 119 S.Ct. 555 (1998) (noting that Congress enacted civil penalty provisions to deter securities law violations); *S.E.C. V. Opulentica*, 479 F.Supp.2d 319, 331–32 (S.D.N.Y. 2007) ("Disgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if he is not detected, and requires only a return of ill-gotten gains if he is caught.") (citation omitted).

Moreover, the Commission requests only a one-time penalty for each of the Motion Defendants, rather than penalties per victim, transaction, or any other multiple. While the Court is sympathetic to some of the Motion Defendants' current

financial hardships, all of these Brokers and Sub-Brokers received hundreds of thousands, if not millions, of dollars by participating in this scheme and misleading between 70 and 348 investors each.  In light of the seriousness and magnitude of each of the Motion Defendants' wrongdoings, one-time penalties are more than fair. Accordingly, the Court recommends that the Commission be awarded civil penalties in the following amounts:  (i) $65,000 from each of Salvatore Ciccone, Curran, Dunaske and Roaldsen; and (ii) $130,000 from each of Dunne and Michael Keryc.

## III.  CONCLUSION

For the reasons stated above, the Court respectfully recommends that the SEC's motion for damages be granted.

## IV.  OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.  Counsel for the SEC is directed to serve a copy of it on all *pro se* Defendants via first-class mail and file proof of service by ECF within three days of the date below.  Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:          Central Islip, New York
                November 11, 2021

                                        /s/ Steven I. Locke
                                        STEVEN I. LOCKE
                                        United States Magistrate Judge